Judge Leighton

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR13-5633RBL |
| Plaintiff, | |
| v. | GOVERNMENT'S SENTENCING MEMORANDUM |
| JASON A. GREEN, | |
| Defendant. | |

The United States of America, by and through Annette L. Hayes, Acting United States Attorney for the Western District of Washington, and Arlen R. Storm, Assistant United States Attorney for the Western District of Washington, hereby submits its Sentencing Memorandum in the above-entitled case.

## I.      BACKGROUND

*Green and Dillingham Conspire to Submit False Invoices to US Foodservice*

Jason Green and Jimmie Dillingham were friends who both bowled on the same bowling team and gambled together.  Dillingham operated a company called J.D. Striping, through which, among other things, he striped parking lots.  Green, on the other hand, was Vice President of Finance for the NW Division of US Foodservice.

As the Vice President of Finance, Green had authority to select vendors and review and approve their invoices.  On October 10, 2005, Green assisted Dillingham in

1  becoming a US Foodservice vendor by, among other things, faxing relevant documents to
2  the US Foodservice Vendor Support Office in Phoenix, Arizona.  Thereafter, during
3  March 2008, Dillingham started submitting invoices to US Foodservice for various small
4  jobs that J.D. Striping actually had performed.

5  Beginning in July 2009, however, Green and Dillingham conspired to submit false
6  J.D. Striping invoices to the US Foodservice Vendor Support Office.  In carrying out this
7  scheme, they submitted false invoices for various services, including making repairs at
8  the US Foodservice "Ridgefield" facility in Vancouver, Washington, and pressure
9  washing trucks at the US Foodservice "Stock Yards" facility in Renton.  J.D. Striping had
10 not, in fact, provided these services.  Rather, US Foodservice sold Ridgefield "as is" and
11 another company, Coles Truck Washing Service, pressure washed US Foodservice's
12 trucks at the Stock Yards.

13  During the fall of 2009, moreover, Green and Dillingham agreed that Dillingham
14 would create a second business entity, Day and Night Security, and that they also would
15 submit to US Foodservice false Day and Night Security invoices.

16  Pursuant to their agreement, Dillingham registered the trade name Day and Night
17 Security, and opened a bank account in that name.  During a telephone call on
18 October 19, 2009, moreover, Green falsely told M.W. of Securitas, the company that had
19 been providing security services at Ridgefield, that because business was picking up, the
20 Ridgefield warehouse was no longer abandoned, and that, as a result, US Foodservice no
21 longer needed security at the warehouse.  The following day, October 20, 2009, Green
22 faxed a Day and Night Security W-9 to the US Foodservice Vendor Support Office in
23 Phoenix, in order to establish Day and Night Security as a US Foodservice vendor.

24  Green and Dillingham proceeded to bill US Foodservice for security guard
25 services for "18 hours per day - Seven days per week."  Day and Night Security, however,
26 was not providing the security guard services for which it was billing US Foodservice.
27 Between June and August 2010, in preparing to purchase the Ridgefield facility, G.A.,
28 Director of Operations for NW Natural Products ("NNP"), and others, visited the

GOVERNMENT'S SENTENCING
MEMO/GREEN (CR13–5633RBL) - 2

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  Ridgefield facility on at least 15 separate occasions.  During these visits, they never saw
2  any on-site security guards.  On numerous occasions, moreover, Green and Dillingham
3  submitted multiple Day and Night Security invoices to US Foodservice for the same
4  month: (1) two invoices were submitted for April 2010, billing a total of $26,000; (2) two
5  invoices were submitted for June 2010, billing a total of $28,000; (3) four invoices were
6  submitted for July 2010, billing a total of $42,000; and (4) two invoices were submitted
7  for August 2010, (the monthly fee charged also was doubled that month), billing a total
8  of $60,000.

9  *Roles in the Offense*

10  Green created the fraudulent J.D. Striping and Day and Night Security Invoices
11  and caused them to be submitted to the US Foodservice Vendor Support Office.[1]
12  In addition, Green either personally approved the fraudulent invoices, or directed another
13  US Foodservice employee, T.H., to approve them.  Because the invoices were for such
14  large amounts, in order to conceal the activity, Green accessed the US Foodservice
15  computer database and reclassified the General Ledger Codes assigned to them.  In doing
16  so, he often grouped a fraudulent expenditure with other expenditures, then assigned
17  multiple, unrelated General Ledger Codes to the group, making it appear as though a
18  single fraudulent expenditure consisted of multiple smaller expenditures for completely
19  unrelated goods and services.  Upon cashing the checks, Dillingham maintained two-
20  thirds of the proceeds and delivered one-third of the proceeds to Green.[2]

21

22  [1] On at least one occasion, May 2, 2010, however, after creating a fraudulent Invoice, Green emailed it to
23  Dillingham, along with directions for Dillingham to mail the fraudulent invoice to the US Foodservice
     Vendor Support Office.

24  [2] A review of Green's bank account records has revealed that prior to commencing the scheme, Green had
25  not made sizeable cash deposits.  After commencing the scheme in July 2009, however, Green made 29
     large cash deposits, totaling $39,003, to his personal bank account.  In addition, on May 12, 2010, and
26  November 26, 2010, Dillingham completed deposit slips and made cash deposits of $6,000 and $5,000,
     respectively, to Green's personal account.  On July 8, 2010, moreover, Dillingham issued a $5,000 check
27  to Green on the Day and Night Security account.  All of these deposits to Green's account were made
28  shortly after Dillingham deposited fraudulently obtained US Foodservice checks into Dillingham's bank
     accounts, and subsequently withdrew large amounts of cash.

GOVERNMENT'S SENTENCING
MEMO/GREEN (CR13–5633RBL) - 3

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

*Use of Scheme Proceeds*

By at least 2009, Dillingham and Green, using scheme proceeds, were gambling, and losing, heavily.  A review of ATM withdrawals has revealed that Dillingham and Green, and/or Green's wife, were at the Muckleshoot Casino in Auburn on the same date 33 times between August 15, 2009, and December 13, 2010.  Their bank records further reveal that during a typical visit to the Muckleshoot Casino, Green and Dillingham made multiple withdrawals from their bank accounts, in increments of $200 to $500. Muckleshoot Casino Players Club records, moreover, reveal that between January 2008, and December 2010, Dillingham lost $135,623, and Green lost $44,926, at the Muckleshoot Casino.  In addition, those records reveal that during 2010, alone, Dillingham and Green gambled at the Muckleshoot Casino on approximately 135 days and 100 days, respectively.

*Green and Dillingham Wind Up the Scheme*

By late-2010, Green realized that, given his manipulation of the company's books, US Foodservice might become aware of the fraud.  Before shutting down the fraud, however, Green and Dillingham submitted large fraudulent invoices to US Foodservice on behalf of both J.D. Striping and Day and Night Security.

For example, as alleged in Count 1 of the Information, on November 22, 2010, Green caused to be electronically submitted to the US Foodservice Vendor Support Office in Phoenix, J.D. Striping invoices for March, April, May, June, July, and August 2010, billing US Foodservice $7,104.50 per month, for a total of $42,627, for services performed at the Stock Yards facility in Renton, that is, "Pressure Washing Services - Monday to Saturday Service - On-Site - Tractors & Trailers - Building Parking Lot - Monthly."  Green personally electronically approved this invoice.

In the initial processing of this transaction, the single $42,627 expenditure was classified as General Ledger Code no. 14000000, that is, a "Prepaid Expense."  In order to minimize the likelihood that the expenditure would attract attention, however, on December 9, 2010, Green accessed the US Foodservice computer database and

GOVERNMENT'S SENTENCING
MEMO/GREEN (CR13–5633RBL) - 4

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  reclassified the General Ledger Code, changing it to unrelated General Ledger Codes
2  reflecting six smaller purchases.

3        Upon receiving a $42,627 check from US Foodservice, Dillingham deposited the
4  check into his J.D. Striping bank account.  Thereafter, on November 25, 2010,
5  November 26, 2010, November 29, 2010, and November 30, 2010, Dillingham made six
6  cash withdrawals, totaling approximately $28,000.

7        Dillingham paid a portion of the scheme proceeds to Green.  On November 26,
8  2010, Dillingham completed a deposit slip for Green's personal account and deposited
9  $5,000 in cash into the account.  In addition, on that same date, Green made a $1000 cash
10  deposit into his personal account.  Between November 30, 2010, and December 1, 2010,
11  moreover, Green made additional cash deposits totaling $2,000 to his personal account.

12          *Green Seeks to Explain an Accounting Shortfall to US Foodservice, and*
13          *Quits His Job When Executives Question His Conduct*

14        Given that Green had reclassified the General Ledger Codes assigned to a number
15  of the fraudulent invoices to reflect transactions involving the Workers Compensation
16  account, Green realized that accounting issues would ensue.  Accordingly, on December
17  2, 2010, during a conversation with G.G., General Manager of the Stock Yards, Green
18  told G.G. there was an issue with the Workers Compensation account at US Foodservice,
19  and blamed the problems on Green's predecessor.

20        On December 7, 2010, Green also told T.V.O., President of the NW Division of
21  US Foodservice, that there were problems with the Workers Compensation account, and
22  that US Foodservice would not be receiving an anticipated $500,000 refund from the
23  State of Washington.  On December 10, 2010, T.V.O. and US Foodservice Western
24  Region Corporate Controller J.W. met with Green.  When asked why J.D. Striping and
25  Day and Night Security were being paid via the Workers Compensation account, Green
26  asserted that he had made some accounting mistakes.  When T.V.O. asked Green to go
27  through the records line by line, however, Green refused and resigned.

28

GOVERNMENT'S SENTENCING
MEMO/GREEN (CR13–5633RBL) - 5

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1 | *The Government's Investigation*

2     After obtaining and reviewing U.S. Foodservice's records, along with Green's and

3 Dillingham's bank records, investigating agents, on May 24, 2011, interviewed Green.

4 Among other things, they asked Green if Dillingham's companies had done any

5 legitimate work for US Foodservice. Green responded that "to say all the work that J.D.

6 Striping did was not legitimate would be inaccurate." When further asked if the

7 misappropriation of funds was a scheme with Dillingham that got out of control, Green

8 nodded his head in agreement, but did not respond verbally.

9     After that interview, the government proceeded to interview additional witnesses

10 and obtain the business records it anticipated it would need to prove the scheme,

11 including its scope, beyond a reasonable doubt. Among other records, the government

12 obtained Muckleshoot Players' Club records, UPS delivery records, personal and

13 business tax returns created and filed by Dillingham's accountant, Washington State

14 Department of Revenue State Business Records relating to J.D. Striping and Day and

15 Night Security Services, Experian and Equifax records, JP Morgan Chase bank records,

16 and Coles Truck Washing business records. In addition, during July 2012, the

17 government obtained a search warrant for two computers Green used while he was

18 employed by US Foodservice.

19     After evaluating the evidence, the government, on December 5, 2012, hand

20 delivered a "target letter" to Green notifying him that it had determined that there was

21 sufficient evidence to charge him, and requesting him to obtain counsel. In fact, Green

22 obtained counsel, and, on November 25, 2013, he entered a guilty plea to an Information

23 charging him with Mail Fraud.

24     Because agents were unable to set up an in-person meeting with Dillingham, the

25 government mailed a target letter to Dillingham in early-December, 2012. Because

26 Dillingham did not obtain counsel, however, the government proceeded with its

27 investigation, and on July 23, 2014, it sought and received an Indictment charging

28

GOVERNMENT'S SENTENCING
MEMO/GREEN (CR13–5633RBL) - 6

Dillingham with Mail and Wire Fraud.  On November 20, 2014, Dillingham also entered a guilty plea.

## II.  GUIDELINE CALCULATIONS

The government agrees with the Presentence Report that Jason Green's total offense level is 22 and that his criminal history category is I.  In addition, the government agrees that the resulting applicable guideline range is 41 to 51 months' imprisonment.

## III.  THE GOVERNMENT'S RECOMMENDATION

At sentencing, the government will recommend a sentence of 30 months' imprisonment, to be followed by a three-year term of supervised release.  In addition, the government will recommend restitution in the amount of $496,845.

Having been convicted of Grand Theft at the age of nineteen, Green, nevertheless, went on to obtain a well-paying job with a respected company.  After US Foodservice demonstrated its trust in him by naming him Vice President of Finance, however, Green, for more than a year, repeatedly and egregiously violated US Foodservice's trust.  In doing so, moreover, Green surely must have realized the potential jeopardy he placed T.H. in, by causing T.H. to approve Green's fraudulent invoices, as well as the potential jeopardy he placed his predecessor in by blaming accounting errors on him.  While Green had more than a year to reconsider his conduct, during the final months of the scheme, Green both increased the amount of the fraudulent bills he submitted and repeatedly double billed US Foodservice.

Given the seriousness of Green's offense, as reflected by the harm he inflicted and the extended length of time during which he committed it, and the need to deter Green from future crimes, as reflected by the tenacity with which he pursued this fraud and his prior conviction for Grand Theft, the government believes that a significant sentence, within the guideline range, would be appropriate in this case.  In light of the mitigating facts set forth in the government's departure motion, however, at sentencing, government will recommend a sentence of 30 months' imprisonment.  The government believes that this sentence will reflect the seriousness of the offense, promote respect for

GOVERNMENT'S SENTENCING
MEMO/GREEN (CR13–5633RBL) - 7

1  the law, provide just punishment for the offense, and deter Green and others from

2  engaging in similar conduct.[3]

3       In making this recommendation, the government is cognizant of the fact that

4  Green's codefendant, Jimmie Dillingham, Jr. entered a guilty plea in which he admitted

5  to a loss amount of $215,638.  That loss amount likely will provide Dillingham with a

6  two-point reduction in his offense level.  If the same reduction were applied to Green, his

7  offense level would be 37 to 46 months' imprisonment.  That guideline range, however,

8  would not alter the government's recommendation.

9       DATED this 9th day of January, 2015.

10                  Respectfully submitted,

11

12                  ANNETTE L. HAYES
                    Acting United States Attorney

13                  */s/Arlen R. Storm*

14                  ARLEN R. STORM

15                  Assistant United States Attorney
                    U.S. Attorney's Office

16

_____

17  [3]  In imposing sentence, the district court must consider the sentencing range calculated under the

18  Guidelines, together with the other factors set forth in Title 18, United States Code, Section 3553(a), including:  (1) the nature and circumstances of the offense; (2) the history and characteristics of the

19  defendant; (3) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (4) the need for the sentence to afford adequate

20  deterrence to criminal conduct; (5) the need for the sentence to protect the public from further crimes of the defendant; (6) the need to provide the defendant with educational and vocational training, medical

21  care, or other correctional treatment in the most effective manner; (7) the kinds of sentences available; (8) the need to provide restitution to victims; and (9) the need to avoid unwarranted sentence disparity among

22  defendants involved in similar conduct who have similar records.  18 U.S.C. § 3553(a).

23

24    The district court must "set forth enough to satisfy the appellate court that [it] has considered the parties' arguments and has a reasoned basis for exercising [its] legal decision making authority."  *Rita v. United*

25  *States*, 551 U.S. 338, 339 (2007).  The "law leaves much, in this respect, to the judge's own professional judgment," however.  *Id.*  "The district court need not tick off each of the § 3553(a) factors to show that it

26  has considered them."  *United States v. Carty*, 520 F.3d 984, 992 (9th Cir. 2008) (*en banc*).  Instead, appellate courts "assume that district judges know the law and understand their obligation to consider all

27  of the § 3553(a) factors, not just the Guidelines."  *Id.* (citing *Walton v. Arizona*, 497 U.S. 639, 653 (1990)).  *See also United States v. Knows His Guns*, 438 F.3d 913, 918 (9th Cir. 2006) (consideration of

28  § 3553(a) factors "does not necessitate a specific articulation of each factor separately").

GOVERNMENT'S SENTENCING
MEMO/GREEN (CR13–5633RBL) - 8

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2015, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing

to the attorney of record for the defendant.

*/s/Kelly M. Shirkey*
KELLY M. SHIRKEY
Legal Assistant
United States Attorney's Office
1201 Pacific Avenue, Suite 700
Tacoma, Washington 98402
Phone: 253-428-3800
FAX:  253-428-3826
E-mail: Kelly.Shirkey@usdoj.gov

GOVERNMENT'S SENTENCING
MEMO/GREEN (CR13–5633RBL) - 9

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800